## Staves Mfg. Corporation v. Robertson et al.

May 9, 1939.

FAULKNER & FAULKNER for appellant.

M. C. BEGLEY and A. U. SIMMONS for appellees.

OPINION OF THE COURT BY JUDGE PERRY—Affirming in part and reversing in part.

The Staves Manufacturing Corporation seeks by this appeal to procure the reversal of a judgment for $4,930.74 recovered against it by the appellee, Energy Stave & Heading Company.

In March, 1935, the appellant, Staves Manufacturing Corporation of Detroit, Michigan, purchased of the Kentucky River Coal Corporation all the white oak trees, of specified measurements, on a 2,900 acre timber tract in Leslie county, Kentucky.

Thereupon, the stave corporation, through its agent and secretary, C. B. Talbot, entered into negotiations with A. W. Robertson, a stave manufacturer then operating such a business at Poplar Bluff, Missouri, looking to the end of contracting with him for the manufacture into barrel staves and headings of all of the white oak trees purchased by it within the timber boundary stated. Robertson was called to Kentucky by Talbot for a conference with him as to his undertaking this somewhat extensive manufacturing operation and upon what terms he might be willing to contract to carry out the project.

These negotiations, had at length between them and involving, it appears, considerable "jockeying" on the part of each as to the terms and prices upon which they might agree to undertake and let this work, finally on April 20, 1935, were consummated by the parties entering into the following written contract, whereby the appellee agreed, for the prices and upon the terms therein set out, to manufacture into staves and headings the trees within this timber boundary which appellant had purchased:

"This agreement made and entered into this 20th day of April, 1935, by and between the Staves Manufacturing Corporation of Detroit, Michigan, party of the first part, and the Energy Stave & Heading Company of Poplar Bluff, Missouri, party of the second part.

"Witnesseth, the party of the first part agrees to furnish a mill site in Leslie county, Kentucky,

and the bolts delivered at the mill site for one stave saw and one heading saw.

"The party of the second part agrees to manufacture said bolts into staves and heading pieces. The party of the first part agrees to stack the staves and headings for air drying, if necessary, so as not to block operations of the mill.

"The prices to be paid the party of the second part by the party of the first part for the manufacture of the aforesaid staves and headings to be $12.50 per thousand for 4½″ average bourbon staves and 12½c per set for bourbon headings. Culls and oil grade staves and headings not to be counted, but any monies derived from the sale of said culls, cut-offs and oil grade staves and headings to be divided equally between the parties hereto.

"Count and grading to be made at point of loading, Combs, Kentucky, as delivered, regularly, but in no case less than twice a month. Final settlement to be made at time of shipment, in accordance with inspection made at that time, but in no case longer than 30 days.

"Operation to begin as soon as machinery can be moved in and erected.

"This agreement covers the timber contracted for by the party of the first part with the Kentucky River Coal Company under a contract dated March 20th, 1935."

Having entered into this contract, the Energy Stave & Heading Company proceeded to move its machinery from Missouri to the mill site, located within this timber boundary on what is known as Lower Bad Creek. The installation of the milling machinery and erection of the mill camp were completed about July 1, 1935, when the actual production of barrel staves and headings was begun. The milling operation went on very well for a while, it appears, but soon financial difficulties were encountered by both parties to the contract, in that sufficient returns were not being realized from the milling operation to meet its current expense.

Due to this situation, it appears that dissatisfaction and misunderstandings soon developed between the parties. Appellee contended that appellant was not furnishing it with a statement showing the number of staves

and headings manufactured and shipped by it, nor making periodic settlement therefor with it, as called for and required by their contract, and because of which it was difficult for appellee to obtain sufficient money with which to meet its payrolls and other operating expenses. Appellant insisted that these complaints were groundless and denied that it had not furnished appellee information daily as to the amount of its stave and heading production and insisted that it had from time to time advanced to appellee funds to meet its payrolls and otherwise paid larger amounts of money than were at such times due or owing it under the contract for the staves and headings it had then manufactured.

Despite these discordant conditions, the appellee continued its milling operation, begun about the first part of July, up to October 25, when it notified appellant it was closing down its mill temporarily or until appellant furnished it a written statement showing the amount of its stave and heading production to date and settled with it therefor, as under the terms of the contract it claimed the plaintiff corporation was obligated and required to do.

On October 31, after the appellee's closing down of the mill, appellant filed this suit in the Leslie circuit court, seeking to recover from the defendant, Energy Stave & Heading Company (a partnership composed in its membership of A. W. Robertson and H. J. Ellis) the sum of $975.11, both for money advanced it and for certain of its milling debts, which appellant had been required to assume, and the further sum in damages of $2,500, by reason of appellee's alleged breach of the contract in closing down the milling operation.

For the sake of brevity, we will hereinafter refer to the Staves Manufacturing Corporation as plaintiff and the Energy Stave & Heading Company as defendant.

Grounds of attachment were stated in the petition and an attachment asked for, which was issued against the defendant, sued as a non-resident corporation.

The defendant, on November 12, 1935, filed its verified answer, controverting the grounds of attachment and averring that it was a partnership and not a corporation, and moved that the attachment be discharged, which motion, uncontested by appellant, was sustained.

Following this, defendant filed an amended answer.

counter-claim and cross-petition, categorically denying the allegations of the petition. By a second paragraph, it set out the contract made and entered into between the parties on April 20, 1935, and alleged that the defendant had contracted therein to manufacture for it, into staves and heading pieces, 8,000 trees which it alleged were purchased by plaintiff from the Kentucky River Coal Corporation.

Further defendant alleged that it had, from the time of beginning its stave manufacturing operations, pursuant to their contract, on July 3, 1935, up to October 25, 1935, (when it temporarily closed down the mill,) manufactured and delivered to plaintiff, under the terms and at the prices provided for in their contract:

| | | |
|---|---|---:|
| 376,585—4½″ | staves, for which it owes defendant | $4,707.31 |
| 1,673 | sets of bourbon headings, for which it owes defendant | 209.21 |
| 1,369 | sets of oil headings, for which it owes defendant | 68.45 |

Also defendant alleged that plaintiff owed it the further sums of $702.22, which it had paid for labor in hauling staves from the mill to the yard, at the special instance and request of plaintiff, and which it had agreed to repay and $589.26, representing cash items advanced plaintiff and money paid for labor and supplies for plaintiff, which amount plaintiff also had promised but failed to repay.

These several amounts, counterclaimed for as owing by the plaintiff, totaled $6,276.45, on which defendant alleged plaintiff was entitled to a credit of $3,053.91, for money paid or advanced defendant at intervals during its operation of the mill, leaving a net balance due and owing by plaintiff to defendant of $3,222.54. Further damages were sought in the sum of $11,939.76 alleged caused defendant by plaintiff's refusing to permit it to complete its contract, calling for defendant's manufacturing into staves and headings all of the timber mentioned in the contract, from which it alleged it would have realized a profit, when computed at the contract prices, of $11,939.76.

A second amended answer and counterclaim was filed, by which defendant claimed that plaintiff had further violated the contract made with it, by contracting

with one Jim Duff to manufacture into staves and headings a large part of the trees within this timber boundary, for the exclusive manufacture of which it had contracted with defendant.

To this pleading plaintiff filed reply, which was a traverse of all the matters alleged and counterclaimed for. Defendant's rejoinder completed the issues, when a court order was entered transferring the case to equity and appointing a special commissioner to hear evidence on the issues joined and make report.

Voluminous evidence was taken before the commissioner, in which some 120 exhibits were filed. Upon the proof heard, when considered with the pleadings and exhibits, he filed report of his finding and conclusions based thereon, wherein he set out that due to the disagreement of the parties as to the proper interpretation, meaning and effect of paragraphs 3, 4 and 5 of the contract, he had been called on to construe them and that, in harmony therewith, after a careful study of the case, he had reached the following findings and conclusions, based thereon:

"(1) That the plaintiff is indebted to the defendant in the sum of $116.30 with legal interest until paid.

"(2) That the plaintiff * * * is the owner of the heading mill and the defendant * * * is the owner of the stave mill.

"(3) That the plaintiff did not breach its contract in any manner, except in its contract with Jim Duff; that defendant has failed to show any damage which is determinable to any degree of accuracy by reason thereof.

"(4) That defendant breached its contract by closing down its mill October 25, 1935, but plaintiff has failed to show itself entitled to any damages by reason thereof.

"(5) That the total sum of money due upon sale of staves and headings, including oils and cut offs and including 600 bourbons on the mill yard, is $3,257.24.

"(6) That plaintiff's petition be dismissed.

"(7) That defendant recover on its counter-

claim against the plaintiff the sum of $116.30 and costs.

"(8) That the cross-petition against Chess & Wymond be dismissed with its costs.

"(9) That defendant's claim for damages be dismissed."

To this report, the defendant filed exceptions, directed both at his construction given what is designated as paragraphs 3, 4 and 5 of the written contract and some eleven of his sixteen findings of fact.

The first of these constructions given the contract, and excepted to by the defendant, relates to its paragraph 3, by which the defendant agrees to manufacture the bolts, when delivered by plaintiff at the mill, into staves and headings, and the plaintiff agrees "to stack the staves and headings for air drying, if necessary, so as not to block the operations of the mill."

The commissioner's view and interpretation of this provision of the contract is, that as nothing further was said in the contract as to which party should take the staves from the lister or deliver them out to the mill yard, they intended it to mean that "the customary duties of a contractor to manufacture staves were in the contemplation of the parties at the time of the signing of this contract, and that when these staves were taken to the yard, by defendant, the plaintiff would stack all staves and headings, if necessary, and it would seem that it was contemplated by the parties at the time that the plaintiff intended hauling the staves and headings * * *, the plaintiff to stack the staves so that the defendant would not be hindered in any respect in the performance of any of its duties in manufacturing the staves and headings."

The evidence of the parties, as to what were their respective duties under this provision of the contract are in conflict. The defendant claims that an oral agreement, supplemental to the contract, was entered into between them; that as it was by the written contract (paragraph 5) provided that the staves and headings were to be taken by plaintiff from the mill as made, and hauled to Combs, Kentucky, for stacking, inspection and sale and as plaintiff was unable to get sufficient space there for stacking and air drying them, it was then agreed that if defendant would take over this duty of plaintiff, of hauling the staves from the mill or lister,

and stack them in the mill yard, it would pay defendant the cost it incurred in having this work done. Plaintiff denied making this claimed supplemental agreement or that it owed defendant the amount of $702 claimed, or any amount it had expended in having this contract duty of plaintiff performed for it. There is no dispute that the amount of $702 was paid by defendant for having this work done.

The commissioner's construction of this paragraph of the contract and his findings as to the parties' respective duties thereunder is that it was the duty of defendant, in manufacturing the staves under the contract, "to manufacture staves and headings, to make a preliminary grading of them, and to carry them to the stave yard, where plaintiff would receive, grade and stack them, so as not to block defendant in making them," and he disallowed the defendant's claim against plaintiff for this item of $702, representing the cost of grading and hauling the staves and headings, as made, from the mill to the mill yard for air drying.

Defendant's exception to this finding of the commissioner, disallowing recovery of this charge, was overruled by the court and the finding approved.

The next or second exception of defendant relates to the commissioner's construction of paragraph four of the contract, and his findings thereunder, which fixes the prices to be paid defendant for the bourbon or first grade staves and headings manufactured by defendant and further provides that *culls and inferior oil grade staves and headings are not to be counted, but that any monies derived from the sale thereof are to be divided equally between the parties.* It is defendant's contention that by this provision of the contract, it was entitled to receive one-half of any money received by plaintiff for the inferior grade of staves and headings received by it at Combs, where they were to be sold and delivered, without deduction therefrom of one-half of the cost to plaintiff of hauling them to Combs, but not without deduction of freight paid where they were sold not f. o. b. Combs, where by the provisions of the contract all staves and headings were to be delivered and sold, but f. o. b. the point of destination.

The commissioner disallowed defendant's contention in this, his finding and construction of this paragraph of the contract being that it provided only for an

equal division of the net monies received by plaintiff for these low or oil grade staves and headings, or that defendant was entitled to one-half of the amount of their sale proceeds remaining after deducting the expense incurred by plaintiff in hauling them from the mill to the railroad station at Combs.

Defendant's exception to this finding of the commissioner was upon hearing sustained by the court, in that it disapproved the deduction of hauling expense allowed plaintiff and held defendant should be allowed one-half the money received or one-half of the gross receipts had from sale of the staves f. o. b. Combs, without deduction of hauling cost therefrom, and which the court fixed at the amount of $530.70. While defendant claimed that one-half of such gross sale receipts so owing but unpaid it amounted to $818.49, defendant does not insist upon the allowance to it of a larger sum than that adjudged it of $530.70 as due on this item but apparently approves the ruling made.

Defendant's next and last exception urged is directed to the commissioner's construction and finding of fact relative to paragraph 5 of the contract, providing that:

"Counting and grading to be made at point of loading, Combs, Kentucky, as delivered, regularly, but in no case less than twice a month. Final settlement to be made at time of shipment, in accordance with inspection made at that time, but in no case longer than thirty days."

This paragraph sets out definitely where the staves and headings were to be counted and graded; that the counting and grading of the staves was to be done regularly, but in no case less than twice a month. The second sentence of the paragraph clearly provides that the final settlement, directed to be made at the time of shipment in accordance with inspection made at that time, was in no event to be delayed longer than thirty days.

It would seem that these provisions of the contract are sufficiently clear and direct to avoid difficulty in ascertaining the meaning and intent of the parties in so drafting them.

The last paragraph of the contract provides that the contract covers all the trees, of specified measurements, standing upon this large boundary purchased by

appellant and gives the exclusive contract for their cutting and manufacturing into staves and headings to the defendant, from which it follows that plaintiff's contract made with Duff, while its contract with defendant was in full force and effect, was clearly a violation of its terms. In his report, the commissioner treats this breach of the contract by appellant as merely a technical one and held that defendant failed to show that damages, determinable to any degree of accuracy, resulted therefrom.

Upon submission of the cause to the court for judgment upon the defendant's exceptions to the report, the court sustained defendant's exceptions to this finding of the commissioner, in holding that plaintiff had breached the contract by cancelling same when defendant temporarily closed down the mill and further breached it by its refusal to make settlement with the defendant as provided for by the contract, and by reason of which defendant was entitled to damages for the future profits it would have made on the manufacture of staves and headings from the timber embraced in their contract had it been permitted to carry it out.

Further, the court sustained the finding of the commissioner, disallowing the claim of the defendant against plaintiff of $702.22, for costs incurred in making a preliminary grading of the staves and headings at the mill and hauling them to the mill yard for stacking and drying. We are of the opinion that the court erred in overruling defendant's exception to the report, covering this point, in that, as we view it, the contract clearly provides that all the staves and headings are to be removed from the mill and carried to the railroad station at Combs, Kentucky, by plaintiff, where same are to be stacked, inspected, counted and sold and settlement made for same.

Also, paragraph 3 of the contract provides, as stated supra, that plaintiff, as party of the first part, is to stack the staves and headings for drying, if necessary, so as not to block the operations of the mill.

Upon this point the evidence is that upon plaintiff's finding that it could not get a storing yard in which to stack the staves and headings as made, it agreed with defendant that it would have a preliminary grading of them made at the mill and would haul and stack them in the mill yard and that, in the discharge of this con-

tracted duty, the plaintiff would pay defendant the cost incurred in their hauling.

Therefore, we are of the impression that the court was in error in approving the commissioner's disallowance of this claim and that the defendant should be allowed to recover it.

The next item involved in defendant's exceptions relates to the construction of paragraph 4 of the contract, providing that "culls and oil grade staves and headings are not to be counted, but any monies derived from the sale of said culls, cut-offs and oil grade staves and headings are to be divided equally between the parties hereto."

The question here involved is whether, upon a sale of these staves and headings of an inferior or oil grade, the net or the gross sale proceeds of these staves and headings are to be divided equally between the parties.

The commissioner held that this contract provision called for an equal division of the net sale proceeds or, that is, that plaintiff should be allowed to first deduct from the sale proceeds its cost incurred in carrying these inferior staves and headings from the mill site to the railway station before dividing with defendant. Defendant contends that the contract meant what it said, that all monies received therefor were to be equally divided, and that therefore it was entitled to an equal one-half of the gross sale proceeds from this inferior grade of staves and headings.

The trial court was of the impression that the commissioner was in error in his finding on this point and that defendant was entitled to recover one-half of the gross sale proceeds or $530.72. We concur in the trial court's ruling on this point.

Further the commissioner found, upon a balancing of accounts between the parties, that plaintiff owed defendant for staves and headings made and manufactured by it for plaintiff during its period of operating, extending from July 3 to October 25, a total amount of $3,728.97, rather than the amount of some $6,000 as contended for by defendant, and that plaintiff had paid defendant the sum of $3,612.67, leaving a balance owing of $116.30, which finding is approved by the court.

Therefore, there is left but one further point to consider and that is: What is the proper amount and

measure of damages which defendant is to be allowed to recover for plaintiff's adjudged breach of its contract, in cancelling same and in refusing to permit defendant to complete it by manufacturing into staves and headings all the trees embraced in the contract.

It is to be noted that the record shows that the defendant was making a very small margin of profit in manufacturing staves and headings as required under the contract and that it had in fact cleared upon the operation but the sum of $116.30, covering a period of about four months.

We conceive the court erred in the amount of damages awarded defendant as future profits, which the defendant claimed it would have earned in carrying out the contract, in that we conceive both the amount of headings and staves, as well as the net profits it would earn from their manufacture, were overestimated by both the defendant and the court.

We therefore regard it as proper to reverse the judgment on this point and to direct the court to figure out the damages recoverable by the defendant on the basis of the actual profits the record shows it was making in manufacturing the staves and headings while operating under the contract.

The court computed the amount recoverable as based upon 4,000 trees rather than upon 8,000 (as figured by defendant), which we think proper, but we are of the opinion that the defendant's estimate of profit made on both the bourbon staves and headings is improper, for the reason that the defendant figures such profit as based upon its manufacture of a far greater number of staves and headings than the record shows were produced.

The rule as to the damages recoverable for breach of contract is that only such damages may be recovered as may reasonably be considered as arising naturally— that is, according to the usual course of things—from the breach of the contract itself or such as may reasonably be supposed to have been in the contemplation of both parties at the time they made the contract. Western Union Tel. Co. v. Glover, 138 Ky. 500, 128 S. W. 587, 49 L. R. A., N. S., 308; Kentucky Heating Co. v. Hood, 133 Ky. 383, 118 S. W. 337, 22 L. R. A., N. S., 588, 134 Am. St. Rep. 457. Further, the rule is, as to recovery for loss of profits in an action for breach of contract,

that it must be made to appear that such loss of profits was the natural and proximate, not the remote, result or consequence of the breach of the contract and such as may reasonably be supposed to have been within the contemplation of the parties when the contract was made as the probable result of its breach, and that it is further necessary that it be reasonably certain that the profits would have been realized except for the breach of the contract; and further, that when prospective profits are remote, conjectural, and speculative, they cannot be said to be the direct and unavoidable result of the breach and cannot be recovered. Kentucky Utilities Co. v. Warren Ellison Cafe, 231 Ky. 558, 21 S. W. (2d) 976.

In harmony with such limitation upon the amount of damages here recoverable, we direct that the amount of damages adjudged recoverable by defendant should be limited, in order to avoid speculation, to such a profit as it may be shown it earned in this milling operation while actually engaged in cutting and making the trees into staves and headings.

In figuring the actual and reasonable profit defendant was realizing upon its manufacture of the staves and headings, it will be kept in mind that in his earlier estimate thereof he figured as received in the operation the two amounts of $702 and $530, discussed supra, and that therefore they will not be considered as amounts earned additional to those upon which the court will make its reckoning.

It is therefore our conclusion that the judgment of the learned chancellor, according to the directions hereinabove made, should be affirmed in part and reversed in part.